# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 24, 2013     Decided November 1, 2013

No. 13-5069

FRANCIS A. GILARDI, ET AL.,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-00104)

*Francis J. Manion*, pro hac vice, argued the cause for appellants. With him on the briefs were *Colby M. May* and *Carly F. Gammill*.

*Kimberlee Wood Colby* was on the brief for *amici curiae* Association of Gospel Rescue Missions, et al., in support of appellants.

*Deborah J. Dewart* was on the brief for *amicus curiae* Liberty, Life, and Law Foundation in support of appellants.

*Dwight G. Duncan* was on the brief for *amici curiae* 28 Catholic Theologians, et al. in support of appellants.

*Lawrence J. Joseph* was on the brief for *amicus curiae* Eagle Forum Education & Legal Defense Fund in support of appellants.

*William Lee Saunders, Jr.* was on the brief for *amici curiae* American Association of Pro-Life Obstetricians and Gynecologists, et al. in support of appellants.

*Dorinda C. Bordlee* was on the brief for *amici curiae* Abortion Breast Cancer Coalition, et al. in support of appellants.

*Noel J. Francisco* was on the brief for *amicus curiae* Archdiocese of Cincinnati in support of appellants.

*Michael Dewine*, Attorney General, Office of the Attorney General of the State of Ohio, and *Jennifer L. Pratt*, Assistant Attorney General, were on the brief for *amcius curiae* State of Ohio in support of appellants.

*Michael F. Smith* was on the brief for *amicus curiae* Life Legal Defense Foundation in support of appellants.

*Alisa B. Klein*, Attorney, U.S. Department of Justice, argued the cause for appellees.  With her on the briefs were *Stuart F. Delery*, Acting Assistant Attorney General, *Ronald C. Machen, Jr.*, U.S. Attorney, *Beth S. Brinkmann*, Deputy Assistant Attorney General, and *Mark B. Stern*, Attorneys.

*Lisa S. Blatt*, *Robert J. Katerberg*, *Andrew S. Macurdy*, and *Julianna S. Gonen* were on the brief for *amici curiae* Center for Reproductive Rights, et al. in support of appellees.

*Charles E. Davidow* and *Marcia D. Greenberger* were on the brief for *amici curiae* American Association of University Women, et al. in support of appellees.

*Ayesha N. Khan*, *Gregory M. Lipper*, and *Daniel Mach* were on the brief for *amici curiae* Americans United for Separation of Church and State, et al. in support of appellees.

*Michelle A. Kisloff* was on the brief for *amici curiae* Ovarian Cancer National Alliance, et al. in support of appellees.

*Martha Jane Perkins* was on the brief for *amici curiae* National Health Law Program, et al. in support of appellees.

*Jennifer C. Pizer*, *Camilla B. Taylor*, and *Thomas W. Ude, Jr.* were on the brief for *amicus curiae* Lambda Legal Defense and Education Fund, Inc. in support of appellees.

*Bruce H. Schneider* was on the brief for *amici curiae* Physicians for Reproductive Health, et al. in support of appellees.

Before: BROWN, *Circuit Judge*, and EDWARDS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN, with whom *Senior Circuit Judge* EDWARDS joins except as to parts VI, VII, and VIII, and with whom *Senior Circuit Judge* RANDOLPH joins except as to parts III and IV.

Opinion concurring in part and concurring in the judgment filed by *Senior Circuit Judge* RANDOLPH.

Opinion concurring in part and dissenting in part filed by *Senior Circuit Judge* EDWARDS.

BROWN, *Circuit Judge.* Two years after our decision *Seven-Sky v. Holder*, 661 F.3d 1 (D.C. Cir. 2011), we are asked to revisit the behemoth known as the Affordable Care Act. This time, however, we are not confronted with a question of constitutional authority. Instead, we must determine whether the contraceptive mandate imposed by the Act trammels the right of free exercise—a right that lies at the core of our constitutional liberties—as protected by the Religious Freedom Restoration Act. We conclude it does.

I

Two brothers, Francis and Philip Gilardi, are equal owners of Freshway Foods and Freshway Logistics—both companies are closely-held corporations that have elected to be taxed under Subchapter S of the Internal Revenue Code. The two companies collectively employ about 400 employees and operate a self-insured health plan through a third-party administrator and stop-loss provider.

As adherents of the Catholic faith, the Gilardis oppose contraception, sterilization, and abortion. Accordingly, the two brothers—exercising their powers as owners and company executives—excluded coverage of products and services falling under these categories.

But along came the Affordable Care Act. Part of the Act directs all group health plans and health insurance issuers to provide, without cost-sharing requirements, preventive care as determined by the Health Resources and Services Administration. 42 U.S.C. § 300gg-13(a)(4). In turn, the Administration issued guidelines requiring coverage for "all

Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity," as prescribed by a healthcare provider. *Women's Preventive Services Guidelines*, HEALTH RES. & SERVS. ADMIN., http://www.hrsa.gov/womensguidelines/; *see* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection Affordable Care Act, 77 Fed. Reg. 8725, 8725–26 (Feb. 15, 2012) (citing the online HRSA Guidelines); *see also* 29 C.F.R. § 2590.715-2713(a)(1)(iv); 45 C.F.R. 147.131(c).[1] There are exceptions—some ephemeral, some permanent—for grandfathered plans, religious organizations, and small businesses. *See* 26 U.S.C. § 4980H(a); *id.* § 4980H(c)(2)(A); 42 U.S.C. § 18011; 45 C.F.R. §§ 147.130(a)(1)(iv)(A)–(B). But the Freshway companies do not fall into any of these categories. As a result, the Gilardis were faced with two choices: adjust their companies' plans to provide the mandated contraceptive services in contravention of their religious beliefs, or pay a penalty amounting to over $14 million per year.[2]

Finding themselves on the horns of an impossible dilemma, the Gilardis and their companies filed suit in district court, alleging the contraceptive mandate violated their rights under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb *et seq.*, the Free Exercise Clause, the Free Speech Clause, and the Administrative Procedure Act. The plaintiffs moved for a preliminary injunction, but the district

[1] For ease of reference, we will refer to this provision as "the contraceptive mandate."

[2] The Gilardis could have dropped their healthcare coverage altogether, but they regard this option as morally unthinkable. *See* J.A. at 41 ¶ 10; J.A. at 52 ¶ 10.

court denied their request. With respect to the Freshway companies, the court determined they could not "exercise" religion and thus no substantial burden on religious exercise was demonstrable under RFRA. As for the Gilardis, the court found any burden on the Gilardis' religious beliefs was indirect.

The plaintiffs timely filed an interlocutory appeal and moved for an injunction pending appeal. After having initially denied their motion, we issued, *sua sponte*, an order giving them a temporary reprieve from the mandate.

## II

Our standard of review for a denial of a preliminary injunction rests upon what aspect of the district court's decision we are examining. Insofar as our review concerns the district court's consideration of the preliminary-injunction factors and the ultimate decision to grant or deny the injunction, we review for an abuse of discretion. *See In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012). But we review the legal conclusions underlying the decision *de novo* and review findings of fact for clear error. *Id.*; *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

"In ruling on a preliminary injunction a key issue—often the dispositive one—is whether the movant has shown a substantial likelihood of success on the merits." *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1083 (D.C. Cir. 2011). To determine this likelihood, we must answer whether the contraceptive mandate of 45 C.F.R. § 147.130(a)(1)(iv), as applied to the Appellants, violates their free-exercise rights as protected by RFRA. As the parties have made eminently

clear, we must separately examine the claims by the Freshway companies and their owners.

## III

We begin with the Freshway companies. Before addressing the merits of their RFRA claim, we must first ask whether they may bring the challenge at all. The statute allows "[a] *person* whose religious exercise has been burdened" to seek judicial relief, but leaves us bereft of guidance on who a "person" is. *See* 42 U.S.C. § 2000bb-1(c) (emphasis added).

For at least one of our sister circuits (as well as the Appellants), the Dictionary Act, 1 U.S.C. § 1, dispositively answers the question. *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1129, 1132 (10th Cir. 2013) (en banc). Under the Act, the definition of "person" extends to "corporations, companies, associations, firms, partnerships, societies, and joint stock companies"—in other words, it encompasses the corporeal and the incorporeal. 1 U.S.C. § 1. The Freshway companies largely depend on the Dictionary Act's elision of the differences in identity, hoping it applies to their RFRA claim.

But the focus on personhood is too narrow; instead, we must construe the term "person" together with the phrase "exercise of religion." *See Rasul v. Myers*, 512 F.3d 644, 668 (D.C. Cir. 2008) ("Because RFRA prohibits the Government from 'substantially burden[ing] a *person's* exercise of religion' instead of simply the exercise of religion, 42 U.S.C. § 2000bb-1(a), we must construe 'person' as qualifying 'exercise of religion.'" (emphasis in original)), *vacated and remanded on other grounds by* 555 U.S. 1083 (2008); *see also* 42 U.S.C. § 2000bb-1(c) ("A *person whose religious exercise*

has been burdened in violation of this section may . . . obtain appropriate relief against a government." (emphasis added)). And RFRA provides us with no helpful definition of "exercise of religion"; all we can glean from the statute is that "'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A). We must therefore turn to the full body of our free-exercise caselaw to discern whether the Freshway companies are persons capable of religious exercise under the statute. *See Rasul*, 512 F.3d at 671; *see also Autocam Corp. v. Sebelius*, --- F.3d ----, 2013 WL 5182544, at *7 (6th Cir. Sept. 17, 2013); *Hobby Lobby*, 723 F.3d at 1167 (Briscoe, C.J., concurring in part and dissenting in part).

IV

The query is simple: do corporations enjoy the shelter of the Free Exercise Clause? Or is the free-exercise right a "purely personal" one, such that it is "unavailable to corporations and other organizations because the 'historic function' of the particular guarantee has been limited to the protection of individuals"? *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 778 n.14 (1978) (quoting *United States v. White*, 322 U.S. 694, 698–701 (1944)). We turn to the "nature, history, and purpose" of the Clause for our answer. *Id.*

At the time of the Framing, a great debate raged on the precise formulation of what we now know as the Free Exercise Clause. *See* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 HARV. L. REV. 1409, 1480–85 (1990). The earliest drafts from the House of Representatives focused on the protection of conscience, rather than the "exercise of religion." *See id.* at

1482; *see also* 1 ANNALS OF CONGRESS 729 (1789) (noting a later amendment to change the Clause's prototype to read: "no religion shall be established by law, nor shall the equal rights of conscience be infringed"). And as the debates went on, strong concerns arose that the rights of religious sects would not be "well secured under the . . . Constitution." 1 ANNALS OF CONGRESS 730 (remarks of Daniel Carroll, Aug. 15, 1789). To address these concerns and others, the House continued to tinker and toil; once the dust had settled, it eventually proposed a constitutional amendment barring Congress from "prevent[ing] the free exercise" of religion and "infring[ing] the rights of conscience." 1 *id.* at 766. But the Senate had different ideas, and in the end, it was the free exercise of religion—standing alone—that was sent to the states for ratification. *See* McConnell, *supra*, at 1488; *see also* LOUIS FISHER, RELIGIOUS LIBERTY IN AMERICA: POLITICAL SAFEGUARDS 56 (2002).

This history reveals two things about the Clause's purpose relevant to our inquiry today. First, the constitutional guarantee "extended the broader freedom of action to all believers," allowing for the inclusion of "conduct as well as belief." McConnell, *supra*, at 1490. Second, the adopted formulation encompassed both individual judgment, as well as "the corporate or institutional aspects of religious belief." *Id.* Because the word religion "connotes a community of believers," the prohibition against the impingement on religious free exercise must be understood to cover the activities of both individuals and religious bodies. *See id.*

And these two groups have been the beneficiaries of the Supreme Court's free-exercise jurisprudence. To be sure, the right has largely been understood as a personal one. Before incorporation, the Court described the free-exercise right as an individual one—"the indefeasible right to worship God

according to the dictates of conscience." *Cummings v. Missouri*, 71 U.S. 277, 304 (1866). Incorporation did nothing to alter that sentiment; shortly after *Cantwell v. Connecticut*, 310 U.S. 296 (1940), the Court reaffirmed the personal nature of the right as part of "the mind and spirit of man." *See Jones v. City of Opelika*, 316 U.S. 584, 594 (1942), *overruled on other grounds by* 319 U.S. 103 (1943); *see also Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 223 (1963) ("[The purpose of the Free Exercise Clause] is to secure religious liberty in the *individual* by prohibiting any invasions thereof by civil authority." (emphasis added)). And that understanding still resonates with the modern Court. *See Zelman v. Simmons-Harris*, 536 U.S. 639, 679 n.4 (2002) (Thomas, J., concurring) ("In particular, these rights inhere in the Free Exercise Clause, which unlike the Establishment Clause protects individual liberties of religious worship.").

That is not to say the Court views organizations as constitutional outliers—indeed, its jurisprudence reflects the foundational principle that religious bodies—representing a communion of faith and a community of believers—are entitled to the shield of the Free Exercise Clause. The Court has heard free-exercise challenges from religious entities and religious organizations. *See Jimmy Swaggart Ministries v. Bd. of Equalization of Cal.*, 493 U.S. 378, 381 (1990); *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 330 (1987); *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 292 (1985); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 107–08 (1952). It has listened to the grievances of religious sects and member congregations. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 699 (2012); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 425 (2006); *Church of the Lukumi Babalu Aye,*

*Inc. v. City of Hialeah*, 508 U.S. 520, 524 (1993). It has even entertained claims by religious and educational institutions. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 579–80 (1983).

Beyond these cases involving religious organizations, however, we glean nothing from the Court's jurisprudence that suggests other entities may raise a free-exercise challenge. But that the Court has never seriously considered such a claim by a secular corporation or other organizational entity is not to say it never will. For the nonce, only one aberrational case comes to mind. In *Gallagher v. Crown Kosher Super Market of Massachusetts, Inc.*, 366 U.S. 617 (1961), a corporation operated by members of the Orthodox Jewish faith challenged the constitutionality of Massachusetts' Sunday closing laws. *See id.* at 618. The Court summarily disposed of the corporation's free-exercise claim, tersely noting that *Braunfeld v. Brown*, 366 U.S. 599 (1961), obviated the need for further discussion. *See Crown Kosher*, 366 U.S. at 631. Technically speaking, the Court did rule on the merits of the case. But it remained *dubitante* about standing—perhaps the novelty of a secular corporation bringing a free-exercise challenge was *too* novel. *See id.* ("Since the decision in [*Braunfeld*] rejects the contentions presented by these appellees on the merits, we need not decide whether appellees have standing to raise these questions."); *cf. Hobby Lobby*, 723 F.3d at 1150 (Hartz, J., concurring). Meanwhile, we need not base a right of free exercise for nonreligious organizations on so thin a reed of caselaw, especially as both we and the Supreme Court have expressed strong doubts about that proposition. *See, e.g.*, *Harris v. McRae*, 448 U.S. 297, 321 (1980) (explaining that a free-exercise challenge is "one that ordinarily requires individual participation"); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 167 (D.C. Cir. 2003) (noting

"the dubious proposition that a charitable corporation not otherwise defined can exercise religion as protected in the First Amendment").

Citing *Citizens United v. FEC*, 558 U.S. 310 (2010), the Freshway companies argue that corporations—religious or otherwise—are entitled to the full array of First Amendment protections, including the right to free exercise. They are not the only proponents of this position. *See Hobby Lobby*, 723 F.3d at 1135 (majority opinion) ("Because Hobby Lobby and Mardel express themselves for religious purposes, the First Amendment logic of *Citizens United,* where the Supreme Court has recognized a First Amendment right of for-profit corporations to express themselves for political purposes, applies as well." (citation omitted)); *see also Conestoga Wood Specialties Corp. v. Sec'y of the U.S. Dep't of Health & Human Servs.*, 724 F.3d 377, 400 (3d Cir. 2013) (Jordan, J., dissenting) (citing *Citizens United*, 558 U.S. at 342). There is an appeal to this simple reasoning; after all, the free-exercise and free-speech rights are enshrined in the same constitutional provision, separated only by a semicolon.

Perhaps Appellants' constitutional arithmetic, *Citizens United* plus the Free Exercise Clause equals a corporate free-exercise right, will ultimately prevail. But we must be mindful that *Citizens United* represents the culmination of decades of Supreme Court jurisprudence recognizing that all corporations speak. *See Conestoga Wood*, 724 F.3d at 384. When it comes to the free exercise of religion, however, the Court has only indicated that people and churches worship. As for secular corporations, the Court has been all but silent.

Consider *Bellotti*—the progenitor of *Citizens United*. When the *Bellotti* Court declared "political speech does not lose First Amendment protection 'simply because its source is

a corporation,'" *Citizens United*, 558 U.S. at 342 (quoting *Bellotti*, 435 U.S. at 784), it reviewed many cases in which the Court invalidated a state law because it "infringe[d on] protected speech by corporate bodies." *Bellotti*, 435 U.S. at 778 n.14. In other words, *Bellotti* crystallized a robust body of caselaw giving rise to the constitutional right of corporate political speech, which the *Citizens United* Court could rely on as a firm foundation.

No such *corpus juris* exists to suggest a free-exercise right for secular corporations. Thus, we read the "nature, history, and purpose" of the Free Exercise Clause as militating against the discernment of such a right. When it comes to corporate entities, only religious organizations are accorded the protections of the Clause. And we decline to give credence to the notion that the for-profit/non-profit distinction is dispositive, as that, too, is absent from the Clause's history. Fortunately, we need not opine here on what a "religious organization" is, as the Freshway companies have conceded they do not meet that criterion.

The Freshway companies alternatively assert they can vindicate the free-exercise rights of their owners. They reason that if "a company is owned and controlled by a few like-minded individuals who share the same religious values and run the company pursuant to those values," the company may serve as the owners' surrogate. Appellants' Br. at 50. This pass-through theory of corporate standing is logically and structurally appealing in light of the government's shell game. And *EEOC v. Townley Engineering & Manufacturing Co.*, 859 F.2d 610 (9th Cir. 1988) provides longstanding, if illusory, support. In *Townley*, the Ninth Circuit concluded—without much in the way of legal substantiation—that the corporation was "merely the instrument through and by which [the owners] express[ed] their religious beliefs." *Id.* at 619.

Admittedly, there is a certain theological congruence to *Townley*'s characterization. The Bible says "faith without works is dead." *James* 2:26 (King James). As amici point out, not only are Catholic employers morally responsible for the management of their companies, "instructing or encouraging someone else to commit a wrongful act is itself a grave moral wrong—i.e., 'scandal'—under Catholic doctrine." Br. of Catholic Theologians at 3. Thus, amici reason, "the Mandate thrusts Catholic employers into a 'perfect storm' of moral complicity in the forbidden actions." Br. of Catholic Theologians at 5; *see also* Br. of the Archdiocese of Cincinnati at 16–17 nn. 6, 7. When even attenuated participation may be construed as a sin, *see, e.g.*, *United States v. Lee*, 455 U.S. 252, 261 n.12 (1982), it is not for courts to decide that the corporate veil severs the owner's moral responsibility.

But dogma does not dictate justiciability. Though *Townley*'s conclusion is theologically defensible, its standing *bona fides*, supported only by a reference to a footnote in *Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290 (1985), are more dubious. The *Alamo Foundation* Court relied on a theory of religious associational standing; in other words, the organization could raise a free-exercise defense on behalf of one of its executives because the executive was an adherent to the group's religious creed. *See id.* at 303 n.26. How this supports standing for a secular corporation to vindicate its owners' free-exercise rights is unclear.

*Townley*'s misconception of religious associational standing has spread from one free-exercise case to another, even creeping its way into the current contraceptive mandate challenges. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109,

1120 (9th Cir. 2009); *see also Monaghan v. Sebelius*, 931 F. Supp. 2d 794, 800–02 (E.D. Mich. 2013); *Geneva Coll. v. Sebelius*, 929 F. Supp. 2d 402, 428 (W.D. Pa. 2013). While we decline the Freshway companies' invitation to accept *Townley*'s *ipse dixit* that closely held corporations can vindicate the rights of their owners, we understand the impulse. The free exercise protection—a core bulwark of freedom—should not be expunged by a label. But for now, we have no basis for concluding a secular organization can exercise religion.

V

That leaves the Gilardis.[3] Obviously, they have no difficulty satisfying the threshold inquiry to which their enterprises succumbed; they are, most assuredly, "persons" under RFRA. *See also Rasul v. Myers*, 563 F.3d 527, 533 (D.C. Cir. 2009) (Brown, J., concurring) ("RFRA does not define 'person,' so we must look to the word's ordinary meaning. There is little mystery that a 'person' is 'an individual human being . . . as distinguished from an animal or a thing.'" (quoting WEBSTER'S NEW INTERNATIONAL DICTIONARY 1606 (1981)). And there is no dispute that the mandate, as directed to the Gilardis, is a palpable and discernible infringement of free exercise. All that stands between the Gilardis and the hope of vindication is the

---

[3] We agree with Judge Edwards that the Gilardis' Article III standing is indisputable. *See* Op. of Edwards, J., at 6–7.

uncertain[4] barrier of the shareholder-standing rule and an inchoate concern about prudential standing—a "jurisdictional issue which cannot be waived or conceded" in this circuit. *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 674 (D.C. Cir. 2013).

The shareholder-standing rule gives us little pause; we are satisfied that the Gilardis have been "injured in a way that is separate and distinct from an injury to the corporation." *See Crosby v. Beam*, 548 N.E.2d 217, 219 (Ohio 1989); *see also Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 757 (7th Cir. 2008) (employing the state-law derivative action rule to address shareholder standing in a federal question case). If the companies have no claim to enforce—and as nonreligious corporations, they cannot engage in religious exercise—we are left with the obvious conclusion: the right belongs to the Gilardis, existing independently of any right of the Freshway companies. Thus, the Gilardis' injury—which arises

---

[4] We assume, without deciding, that Congress did not intend to abrogate the prudential-standing requirement in enacting RFRA. We share Judge Edwards' concerns about whether prudential-standing principles apply to RFRA challenges and whether the shareholder-standing rule is part of the prudential-standing equation. *See* Op. of Edwards, J., at 9–12. But it would be imprudent to decide these questions without the benefit of full briefing on this issue, especially as the Gilardis can easily surmount the shareholder-standing hurdle.

therefrom—is "separate and distinct," providing us with an exception to the shareholder-standing rule.[5]

## VI

We now reach the heart of the Gilardis' RFRA claim. The Act requires the Gilardis to "allege[] a substantial burden on [their] religious exercise." *Kaemmerling v. Lappin*, 553 F.3d 669, 677 (D.C. Cir. 2008). Religious exercise is broadly defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); *see also id.* § 2000bb-2. A "substantial burden" is "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Kaemmerling*, 553 F.3d at 678 (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)).

We begin with the peculiar step of explaining what is *not* at issue. This case is not about the sincerity of the Gilardis' religious beliefs, nor does it concern the theology behind Catholic precepts on contraception. The former is unchallenged, while the latter is unchallengeable. *See id.* at

---

[5] Our conclusion is buttressed by other considerations. First, Ohio caselaw does not treat the derivative-action rule as an unyielding one; to the contrary, some flexibility has been shown when it comes to close corporations such as the Freshway companies. *See, e.g.*, *Yackel v. Kay*, 642 N.E.2d 1107, 1109–10 (Ohio Ct. App. 1994). Moreover, none of the principles underlying the shareholder-standing rule is offended by allowing the Gilardis' suit to proceed—there is no danger of multiple lawsuits, and no creditor or shareholder interests will be compromised as a result of their RFRA challenge. *See* 12B W. FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 5911.50 (2006). We recognize that shareholders of large public corporations will be subject to different constraints and will likely find the burden threshold insuperable.

716 ("Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation."); *see also United States v. Ballard*, 322 U.S. 78, 86 (1944) ("Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs."). Equally uncontroverted is the nature of the Gilardis' religious exercise: they operate their corporate enterprises in accordance with the tenets of their Catholic faith. *See Hobby Lobby*, 723 F.3d at 1189 (Matheson, J., concurring in part and dissenting in part).

The only dispute touches on the characterization of the burden. The burden is too remote and too attenuated, the government says, as it arises only when an employee purchases a contraceptive or uses contraceptive services. We disagree with the government's foundational premise. The burden on religious exercise does not occur at the point of contraceptive purchase; instead, it occurs when a company's owners fill the basket of goods and services that constitute a healthcare plan. In other words, the Gilardis are burdened when they are pressured to choose between violating their religious beliefs in managing their selected plan or paying onerous penalties. *See Thomas*, 450 U.S. at 717–18; *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972) ("The impact of the compulsory-attendance law on respondents' practice of the Amish religion is not only severe, but inescapable, for the Wisconsin law affirmatively compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs."); *Kaemmerling*, 553 F.3d at 678.

The Framers of the Constitution clearly embraced the philosophical insight that government coercion of moral

agency is odious. Penalties are impertinent, according to Locke, if they are used to compel men "to quit the light of their own reason, and oppose the dictates of their own consciences." JOHN LOCKE, A LETTER CONCERNING TOLERATION 13–14 (J. Brook ed., 1792) (1689). Madison described conscience as "the most sacred of all property," James Madison, *Property*, NAT'L GAZETTE, Mar. 29, 1792, at 174, *reprinted in* JAMES MADISON'S "ADVICE TO MY COUNTRY" 25, 83–84 (David B. Mattern ed., 1997), and placed the freedom of conscience prior to and superior to all other natural rights. Religion, he wrote, is "the duty which we owe to our Creator . . . being under the direction of reason and conviction only, not of violence or compulsion," 1 MADISON PAPERS 174 (1962), "precedent" to "the claims of Civil Society," JAMES MADISON, MEMORIAL AND REMONSTRANCE AGAINST RELIGIOUS ASSESSMENTS (1785); *see also United States v. Macintosh*, 283 U.S. 605, 633–34 (1931) (Hughes, C.J., dissenting) ("[I]n the forum of conscience, duty to a moral power higher than the state has always been maintained. . . . The essence of religion is belief in a relation to God involving duties superior to those arising from any human relation.").

From thence sprang the idea that the right to free exercise necessarily prohibits the government from "compel[ling] a man to furnish contributions of money for the propagation of opinions which he disbelieves." THOMAS JEFFERSON, THE VIRGINIA ACT FOR ESTABLISHING RELIGIOUS FREEDOM (1786). And that prohibition has plainly manifested itself throughout the years as an integral component of the free-exercise guarantee. Justice Brennan, writing for the Court in *Sherbert v. Verner*, 374 U.S. 398 (1963), put it well: "Government may neither compel affirmation of a repugnant belief, nor penalize or discriminate against individuals

because they hold religious views abhorrent to the authorities." *Id.* at 402 (citations omitted).

The contraceptive mandate demands that owners like the Gilardis meaningfully approve and endorse the inclusion of contraceptive coverage in their companies' employer-provided plans, over whatever objections they may have. Such an endorsement—procured exclusively by regulatory ukase—is a "compel[led] affirmation of a repugnant belief." *See id.* That, standing alone, is a cognizable burden on free exercise. And the burden becomes substantial because the government commands compliance by giving the Gilardis a Hobson's choice. They can either abide by the sacred tenets of their faith, pay a penalty of over $14 million, and cripple the companies they have spent a lifetime building, or they become complicit in a grave moral wrong. If that is not "substantial pressure on an adherent to modify his behavior and to violate his beliefs," we fail to see how the standard could be met. *See Thomas*, 450 U.S. at 718.

In suggesting that no substantial burden lies with the Gilardis, the government invokes the principles undergirding the bargain for the corporate veil. True, it is an elementary principle of corporate law that "incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001). And as part of that fiction, shareholders forgo certain rights pertaining to the corporation. *See Grote v. Sebelius*, 708 F.3d 850, 858 (7th Cir. 2013) (Rovner, J., dissenting). But we cannot simply stop there. Shareholders make such a sacrifice because the corporation can generally exercise some analogue of the forgone right. As a corporation is "capable of making and executing

contracts, possessing and owning real and personal property in its own name, suing and being sued," a shareholder cannot expect to exercise the right to take these actions in his or her personal capacity. *See* 1 W. FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 25 (2006). This is no less true with constitutional rights. *See Franks v. Rankin*, Nos. 11AP-934, 11AP-962, 2012 WL 1531031, at \*10 (Ohio Ct. App. May 1, 2012) (rejecting a shareholder's due process claim brought on behalf of the corporation).

Mindful of these principles, consider the ramifications of the government's argument. It contends free exercise is an individual right. If the Gilardis had run their businesses as sole proprietorships, they would presumably have a viable RFRA claim under the government's theory. *Cf. Braunfeld*, 366 U.S. at 601 (describing individual merchants who challenged a Sunday closing law under the Free Exercise Clause). But the government, relying on what is perhaps an incomplete understanding of corporate law, argues the Gilardis lose the ability to make such a claim by taking advantage of state incorporation law. And as a corollary to the government's expansive theory, the party being regulated—the corporation—cannot make a free-exercise claim, as it is not an individual capable of exercising religion. So, in the government's view, there is no corporate analogue, and the individual right disappears into the ether.

This interpretation is perplexing and troubling. It is perplexing because we do not believe Congress intended important statutory rights to turn on the manner in which an individual operates his businesses. The government's logic is also quite troubling because it would eventually reach First Amendment free-exercise cases. The same language, "exercise" "of religion," appears both in the Constitution and RFRA. *Compare* U.S. CONST. AMEND. I ("Congress shall

make no law respecting an establishment *of religion*, or prohibiting *the free exercise* thereof . . . ."), *with* 42 U.S.C. § 2000bb-1(a) ("Government shall not burden a person's *exercise of religion* . . . ."). Thus, if the government is correct, the price of incorporation is not only the loss of RFRA's statutory free-exercise right, but the constitutional one as well. And that would create a risk of an unconstitutional condition in future cases. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("[T]his Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on the basis that *infringes on his constitutionally protected interests . . . .*" (emphasis added)).

A parade of horribles will descend upon us, the government exclaims, if religious beliefs could serve as a private veto for the contraceptive mandate. Hyperbole aside, we note it was *Congress*, and not the courts, that allowed for an individual's religious conscience to prevail over substantially burdensome federal regulation. In *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006), the Supreme Court provided an apt response:

The Government's argument echoes the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions. But RFRA operates by mandating consideration, under the compelling interest test, of exceptions to "rule[s] of general applicability." 42 U.S.C. § 2000bb-1(a). Congress determined that the legislated test [of RFRA] "is a workable test for striking

23

sensible balances between religious liberty and competing governmental interests." § 2000bb(a)(5).

*Id.* at 436 (alteration in original).

## VII

As the Gilardis have demonstrated the substantial nature of their burden, we now turn to strict scrutiny, a "searching examination" where the onus is borne exclusively by the government. *Fisher v. Univ. of Tex.*, 133 S. Ct. 2411, 2419 (2013); *see also* 42 U.S.C. § 2000bb-1(b). "[U]nless the government demonstrates a compelling governmental interest, and uses the least restrictive means of furthering that interest," the mandate must be set aside. *See Holy Land*, 333 F.3d at 166 (internal quotation marks omitted); *see also* 42 U.S.C. § 2000bb. While "strict scrutiny must not be strict in theory, but fatal in fact," neither should it be "strict in theory but feeble in fact." *Fisher*, 133 S. Ct. at 2421 (internal quotation marks omitted).

## A

It is difficult to divine precisely what makes an interest "compelling," but a few reliable metrics exist. The interest cannot be "broadly formulated"—the test demands particularity. *See O Centro*, 546 U.S. at 431 (citing *Yoder*, 406 U.S. at 213, 221). The "compelling" nature of the interest is contingent on its context. *See id.* (citing *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 228 (1995)). And the interest must be "of the highest order," *Yoder*, 406 U.S. at 215, meaning it cannot leave "appreciable damage to [a] supposedly vital interest unprohibited," *Lukumi*, 508 U.S. at 547 (quoting *Florida Star v. B.J.F.*, 491 U.S. 524, 541–42

(1989) (Scalia, J., concurring in part and concurring in the judgment)).[6]

The government cites several concerns to bolster its claim that the contraceptive mandate serves a compelling interest (or interests), but its recitation is sketchy and highly abstract. Perhaps the government thought it best to focus on justiciability, hoping its *ipse dixit* would be sufficient to survive strict scrutiny. After all, if no one has standing to object, the state avoids the searching inquiry into its means. Here, the articulated concerns range from "safeguarding the public health" to "protecting a woman's compelling interest in autonomy" and promoting gender equality. But the government does little to demonstrate a nexus between this array of issues and the mandate.

For example, as a standalone principle, "safeguarding the public health" seems too broadly formulated to satisfy the compelling interest test. It has been used to justify all manner of government regulations in other contexts. *See Roe v. Wade*, 410 U.S. 113, 154 (1973) (abortion laws); *Loxley v. Chesapeake Hosp. Auth.*, No. 97-2539, 1998 WL 827285, at *4 (4th Cir. Dec. 1, 1998) (competence of medical personnel); *Dunagin v. City of Oxford*, 718 F.2d 738, 747 (5th Cir. 1983) (en banc) (liquor advertisement rules). And here, the government relies on the broad sweep of that interest once more, citing *Mead v. Holder*, 766 F. Supp. 2d 16, 43 (D.D.C. 2011), an individual-mandate case in which a district court found the public health interest sufficient. But the invocation of the interest in *Mead* seems empty, reflexive, and

---

[6] Much ink has already been spilled on how the government's interests leave "appreciable damage" unprohibited. *See Conestoga Wood*, 724 F.3d at 413–14 (Jordan J., dissenting); *Hobby Lobby*, 723 F.3d at 1143–44. We share these concerns, but need not repeat them here.

talismanic. The government cites *Mead* as if to say, "once a compelling interest, always a compelling interest." It fails to recognize that "safeguarding the public health" is such a capacious formula that it requires close scrutiny of the asserted harm. *See O Centro*, 546 U.S. at 431. We cannot be satisfied with the government's representation as to the compelling nature of the interest simply because other courts have reached that conclusion in the generality of cases. *See Yoder*, 406 U.S. at 221.

The nebulousness of the government's interest, however, prevents us from engaging in the type of exacting scrutiny warranted here. What exactly is the government trying to ameliorate? Is it the integrity of "the health and insurance markets"? Surely, that cannot be the answer; the comprehensive sweep of the Affordable Care Act will remain intact with or without the mandate. Or is it a need to provide greater access to contraceptive care? If so, as we note below, the reasons underpinning that need are tenuous at best. If we are to assess whether an exemption for the Gilardis would pose an "impediment to [a governmental] objective[]," we must first be able to discern what that objective *is*. *See id.* at 221, 236. Simply reciting *Mead* is not enough.

The government's invocation of a "woman's compelling interest in autonomy" is even less robust. The wording is telling. It implies autonomy is not the state's interest to assert. Nevertheless, the government, quoting *Eisenstadt v. Baird*, 405 U.S. 438 (1972), claims the mandate protects a woman's ability to decide "whether to bear or beget a child." *See id.* at 453.

Our difficulty in accepting the government's rationale stems from looking at the *Eisenstadt* quote in its entirety: "If the right of privacy means anything, it is the right of the

individual, married or single, *to be free from unwarranted governmental intrusion* into matter so fundamentally affecting a person as the decision to bear or beget a child." *Id.* (emphasis added). Regardless of what this observation means for us today,[7] it is clear the government has failed to demonstrate how such a right—whether described as noninterference, privacy, or autonomy—can extend to the compelled subsidization of a woman's procreative practices. Again, our searching examination is impossible unless the government describes its purposes with precision. As with *Mead*, simply invoking *Eisenstadt* is not enough.

Equally unconvincing is the government's assertion that the mandate averts "negative health consequences for both the woman and the developing fetus." From the outset, we note the science is debatable and may actually undermine the government's cause. For the potential mother, as one amicus notes, the World Health Organization classifies certain oral contraceptives as carcinogens, marked by an increased risk for breast, cervical, and liver cancers. Br. of the Breast Cancer Prevention Institute, at 8–9. On the other hand, the contraceptives at issue have been approved by the Food and Drug Administration, supported by research touting their benefits. *See* Op. of Edwards, J., at 30. This tug-of-war gives us pause because the government has neither acknowledged nor resolved these contradictory claims.

Even giving the government the benefit of the doubt, the health concerns underpinning the mandate can be variously described as legitimate, substantial, perhaps even important,

---

[7] *See* A. Raymond Randolph, *Before Roe v. Wade: Judge Friendly's Draft Abortion Opinion*, 29 HARV. J.L. & PUB. POL'Y 1035, 1048 (2006) (describing the transformation of the right described in *Griswold* and *Roe*).

but it does not rank as *compelling*, and that makes all the difference. *Cf. Hutchins v. District of Columbia*, 188 F.3d 531, 541 (D.C. Cir. 1999) (en banc). Caselaw concerning the analogous context of abortion is particularly illuminating in this regard. Time and again, the government's interest in such cases has been deemed legitimate and substantial. *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846 (1992); *see also Gonzales v. Carhart*, 550 U.S. 124, 145 (2007). But it has never been *compelling*. *See Casey*, 505 U.S. at 932 (Blackmun, J., concurring in part and dissenting in part) ("[W]hile a State has 'legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child,' legitimate interests are not enough. To overcome the burden of strict scrutiny, the interests must be compelling."). And we have no reason to believe otherwise here. While we do not exclude the possibility that the state's interest in safeguarding maternal or fetal health sometimes may be compelling, we cannot draw such a conclusion in this particular context. *See O Centro*, 546 U.S. at 431.

Finally, we note "gender equality" is a bit of a misnomer; perhaps the government labeled it as such for the veneer of constitutional importance attached to the term. More accurately described, the interest at issue is resource parity—which, in the analogous abortion context, the Supreme Court has rejected as both a fundamental right and as an equal-protection issue. *See Harris*, 448 U.S. at 317–18 ("Although the liberty protected by the Due Process Clause affords protection against unwarranted government interference with freedom of choice in the context of certain personal decisions, it does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom."); *Maher v. Roe*, 432 U.S. 464, 471 (1977) ("But this Court has

28

never held that financial need alone identifies a suspect class for purposes of equal protection analysis.").

The government cites *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984), to advance its "gender equality" interest. There, the Court observed that "[a]ssuring women equal access to such goods, privileges, and advantages clearly furthers compelling state interests." *Id.* at 626. But when that observation is put into context, it fails to support the government's case. *U.S. Jaycees* concerned an organization that had shut women out entirely from a superior class of membership; it did not involve disparate membership fees or any resource-parity issue that may sustain the government's argument. *See id.* at 613, 628. This case is quite different. Beyond the question of access, it is difficult for the government to suggest the interests of women are monolithic, and unlike *U.S. Jaycees*, the government's proposed solution clearly impinges on other core prerogatives.

B

Let us assume, however, the government has a compelling interest. Even then, we cannot see how the mandate is "the least restrictive means of furthering that . . . interest." *See* 42 U.S.C. § 2000bb-1. It suffers from two flaws that cannot be overcome. First, there are viable alternatives—presented by the Gilardis and others—that would achieve the substantive goals of the mandate while being sufficiently accommodative of religious exercise. *See* Appellants' Br. at 61; *see also Conestoga Wood*, 724 F.3d at 414–15 (Jordan, J., dissenting). The government could defeat these alternatives by proving they would "present an administrative problem of such magnitude, or . . . afford the exempted class so great a competitive advantage, that such a requirement would . . . render[] the entire statutory scheme

unworkable." *Sherbert*, 374 U.S. at 408–09. But it has made no such case; for all we know, a broader religious exemption would have so little impact on so small a group of employees that the argument cannot be made.

Moreover, the mandate is self-defeating. When a government regulation "fail[s] to prohibit nonreligious conduct that endangers [its asserted] interests in a similar or greater degree" than the regulated conduct, it is underinclusive by design.[8] *See Lukumi*, 508 U.S. at 543. And that underinclusiveness can suggest an inability to meet the narrow-tailoring requirement, as it raises serious questions about the efficacy and asserted interests served by the regulation. In this case, small businesses, businesses with grandfathered plans (albeit temporarily), and an array of other employers are exempt either from the mandate itself or from the entire scheme of the Affordable Care Act. Therefore, the mandate is unquestionably underinclusive. *See Hobby Lobby*, 723 F.3d at 1143; *see also Conestoga Wood*, 724 F.3d at 414 (Jordan, J., dissenting) ("It cannot legitimately be said to vindicate a compelling governmental interest because the government has already exempted from its reach grandfathered plans, employers with under 50 employees, and what it defines as 'religious employers', thus voluntarily

---

[8] Underinclusiveness is generally a relevant consideration of the narrow-tailoring inquiry. *See Lukumi*, 508 U.S. at 546 ("First, even were the governmental interests compelling, the ordinances are not drawn in narrow terms to accomplish those interests. As we have discussed, all four ordinances are *overbroad or underinclusive* in substantial respects." (emphasis added)). We recognize the considerable overlap between narrow-tailoring underinclusiveness and the "appreciable damage" component of the compelling-interest prong. Nevertheless, we need not reconcile the distinctions between the two—under both formulations, the government falls short. *See supra* at 24 n.6.

allowing millions upon millions of people—by some estimates 190 million—to be covered by insurance plans that do not satisfy the supposedly vital interest of providing the public with free contraceptives." (internal citations omitted)).

A word on *Lee*. We would be remiss if we omitted this observation by the Court:

> When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.

455 U.S. at 261. The government understands this quote to foreclose free-exercise claims by employers like the Gilardis. But once again, context matters. We mention *Lee* in our narrow-tailoring discussion because that is where it belongs.[9] The Court made the statement quoted above while evaluating whether the "limitation on religious liberty . . . [was] essential to accomplish an overriding governmental interest." *Id.* at 257. In engaging in that inquiry, the Court examined "whether accommodating the Amish belief [would] unduly interfere with fulfillment of the governmental interest [of assuring contribution to the Social Security scheme]." *Id.* at 259.

---

[9] *Lee* also reinforces our doubts about whether the government's asserted interests are sufficiently compelling. The proper functioning of the tax system was perceived as an interest of "a high order," *see* 455 U.S. at 260, akin to interests of "public safety, peace, or order" that justified government intrusions on religious exercise in the past, *see Sherbert*, 374 U.S. at 403. Given our many doubts about the interests posited, we are skeptical about whether the mandate is designed to address "the gravest abuses, endangering paramount interest." *See Sherbert*, 374 U.S. at 406.

31

*Lee* was a rare case in which the government fended off a strict-scrutiny challenge by proving exemptions would "present an administrative problem of such magnitude . . . that such a requirement would have rendered the entire statutory scheme unworkable." *Sherbert*, 374 U.S. at 408–09; *see Lee*, 455 U.S. at 158 ("Moreover, a comprehensive national social security system providing for voluntary participation would be almost a contradiction in terms and difficult, if not impossible, to administer."). Proving the incompatibility of the requested religious exemption was necessary to prove that the government had employed the least-restrictive means. *See Lee*, 455 U.S. at 259–60 ("Unlike the situation presented in [*Yoder*], it would be difficult to accommodate the comprehensive social security system with myriad exceptions flowing from a wide variety of religious beliefs."). Congress had carefully determined the breaking point of Social Security—any uncontemplated exemptions could render the statutory scheme unworkable. *See id.* at 258.

In contrast, the government has not proven—nay, even asserted—statutory unworkability here. Its "private veto" concern is somewhat on point, but without substance or substantiation, is nowhere near enough. If we found narrow tailoring satisfied by mere *ipse dixit*, the strict-scrutiny inquiry would become feeble indeed. And unlike *Lee*, where the government successfully asserted the Social Security system required every contribution that Congress did not otherwise exempt, there is nothing to suggest the preventive-care statute would become unworkable if employers objecting on religious grounds could opt out of one part of a comprehensive coverage requirement. The Gilardis' employees will still receive an array of services such as well-woman visits, gestational-diabetes screenings, HPV testing, counseling for sexually-transmitted infections, support for

breastfeeding, and counseling for interpersonal and domestic violence. *See Women's Preventive Services Guidelines*, HEALTH RES. & SERVS. ADMIN., http://www.hrsa.gov/womensguidelines/. The provision of these services—even without the contraceptive mandate—by and large fulfills the statutory command for insurers to provide gender-specific preventive care. At the very least, the statutory scheme will not go to pieces.

## VIII

We conclude the district court erred in denying a preliminary injunction for the Gilardis on the grounds that their case was unlikely to succeed on the merits; therefore, we reverse the district court's denial of a preliminary injunction for the individual owners. Because the court premised its decision entirely on a question of law, we must remand for consideration of the other preliminary-injunction factors. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 304. We affirm the district court's denial of a preliminary injunction with respect to the Freshway companies.

*So ordered.*

RANDOLPH, *Senior Circuit Judge*, concurring in part and concurring in the judgment:

I do not join parts III and IV of Judge Brown's opinion because I do not believe we need to reach the potentially far-reaching corporate free-exercise question. Other courts in contraceptive-mandate cases have "decline[d] to address the unresolved question of whether for-profit corporations can exercise religion." *Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 114 (D.D.C. 2012); *see Legatus v. Sebelius*, 901 F. Supp. 2d 980, 988 (E.D. Mich. 2012); *cf. Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013) (en banc) (majority opinion) (addressing only claims by corporate, but not individual, plaintiffs). The same approach may be used without deciding the rights of the Freshway Corporations because the government could enforce the mandate against the corporations only by compelling the Gilardis to act. Since "it is not necessary to decide more, it is necessary not to decide more." *PDK Labs. Inc. v. U.S. Drug Enforcement Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment).

We should be particularly hesitant to pass unnecessarily on such a complex issue. If secular for-profit corporations can never exercise religion, what of profitable activities of organized religions? *See Hernandez v. Comm'r*, 490 U.S. 680, 709 (1989) (O'Connor, J., dissenting). If only religious for-profit organizations have a free-exercise right, how does one distinguish between religious and non-religious organizations? *See Hobby Lobby Stores*, 723 F.3d at 1136-37 & n.12; *id.* at 1170-75 (Briscoe, C.J., concurring in part and dissenting in part). Why limit the free-exercise right to religious organizations when many business corporations adhere to religious dogma? *See* Mark L. Rienzi, *God and the Profits: Is There Religious Liberty for Money-Makers?*, 21 GEO. MASON L. REV. (manuscript at 11-24) (forthcoming fall 2013). If non-religious organizations do not have free-exercise rights, why do non-

religious natural persons (athiests, for example) possess them? *Torcaso v. Watkins*, 367 U.S. 488, 495-96 & n.11 (1961). If a corporate free-exercise right is recognized, in any form, there are equally challenging secondary questions. How should the beliefs of a religious corporation be determined? Can publicly traded corporations be religious? If so, do they take on the religions of their shareholders as a matter of course? If a religious corporation is sold, does it retain its religious identity? These questions, challenging in themselves, would confront us in different permutations across the diverse entity forms and organizational structures of the American business landscape.

I also write separately to emphasize the importance of the Freshway Corporations' election to be taxed under subchapter S of the Internal Revenue Code. I.R.C. §§ 1361–1379. As a result, the Freshway Corporations do not pay corporate income taxes. *See* I.R.C. § 1363(a). Instead, the income of the Freshway Corporations passes through, pro rata, to their shareholders, the Gilardis. *See* I.R.C. § 1366(a)(1). Subchapter S disregards the corporate form for purposes of the corporate income tax. We must ask why Congress would have disregarded the corporate form for subchapter S corporations but then wanted it imposed to prevent their owners from asserting free-exercise rights under RFRA. There is no good answer, or at least we have received none. It would be incongruous to emphasize the corporate veil in rigid form for RFRA purposes while disregarding it for tax purposes under subchapter S. This inference is particularly compelling because both subchapter S and the "tax" that enforces the contraceptive mandate are part of the Internal Revenue Code. I.R.C. § 4980D.

The pass-through provisions of subchapter S matter for an additional reason. If the Gilardis do not order the Freshway Corporations to comply with the mandate, then their individual tax returns will be directly affected. As shareholders of an S

Corporation (technically, they are treated as one shareholder under I.R.C. § 1361(c)(1)(A)(ii)), they would "take[] into account" their "pro rata share of the corporation's . . . income" in determining their income tax liabilities. I.R.C. § 1366(a)(1). In other words, as a direct result of the mandate's operation the Gilardis themselves will have less income in each taxable year. This underscores the "pressure on [the Gilardis] to modify [their] behavior and to violate [their] beliefs." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981).

EDWARDS, *Senior Circuit Judge*, concurring in part and dissenting in part:

### TABLE OF CONTENTS

I.  STANDING

    A.  **The Companies Have No Standing to Pursue a Cause of Action Under RFRA**

    B.  **The Owners of the Companies Have Standing in This Case to Pursue a Cause of Action Under RFRA**

II. FREE EXERCISE JURISPRUDENCE

    A.  **First Principles: The Limited Reach of the Free Exercise Clause**

    B.  **The Evolution of the Substantial Burden/Compelling Governmental Interest Test During the Twenty-seven Years from *Sherbert* to *Smith***

    C.  **Congress' Enactment of RFRA in Reaction to *Smith*: Restoration of the Substantial Burden/Compelling Governmental Interest Test**

III. THE MANDATE DOES NOT *SUBSTANTIALLY* BURDEN APPELLANTS' RELIGIOUS OBJECTIONS TO THE USE OF CONTRACEPTIVE PRODUCTS

IV. COMPELLING GOVERNMENTAL INTERESTS JUSTIFY THE MANDATE

\* \* \* \*

I agree that Appellants Francis and Phil Gilardi have standing to pursue a cause of action under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb–2000bb-4. I also agree with Judge Brown that the corporate

entities that are solely owned by the Gilardis, Freshway Logistics, Inc. and Fresh Unlimited, Inc., d/b/a Freshway Foods (collectively "Freshway"), do not have standing to seek relief under RFRA.

However, I strongly disagree with the majority's holding on the merits. Under the Patient Protection and Affordable Care Act of 2010 ("Affordable Care Act"), 42 U.S.C. § 300gg-13(a)(4), Freshway is required to include in its health care plan "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventative Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8725 (Feb. 15, 2012); *see id.* at 8725 n.1 (providing hyperlink to the applicable Health Resources and Services Administration guidelines). The Gilardis contend that compliance with this directive—also known as "the Mandate"—will force them to violate "their Catholic religious beliefs" against contraception. Br. of Appellants at 14.

No one doubts the sincerity of the Gilardis' religious beliefs against contraception. Their legal claim, however, is seriously wanting. The Gilardis complain that the Mandate imposes a "substantial burden" on their "exercise of religion" under RFRA, 42 U.S.C. § 2000bb-1(a), because *their companies* are required to provide health insurance that includes contraceptive services. This is a specious claim.

It has been well understood since the founding of our nation that legislative restrictions may trump religious exercise. *Braunfeld v. Brown*, 366 U.S. 599, 603 (1961). Were it otherwise, "professed doctrines of religious belief [would be] superior to the law of the land, and in effect . . . permit

every citizen to become a law unto himself. Government could exist only in name under such circumstances." *Reynolds v. United States*, 98 U.S. 145, 167 (1878). As the Court noted in *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439 (1988):

> The First Amendment must apply to all citizens alike, and it can give to none of them a veto over public programs that do not prohibit the free exercise of religion. The Constitution does not, and courts cannot, offer to reconcile the various competing demands on government, many of them rooted in sincere religious belief, that inevitably arise in so diverse a society as ours. That task, to the extent that it is feasible, is for the legislatures and other institutions.

*Id*. at 452.

The Gilardis' claim in this case finds no support in the law. They are not required to use or endorse contraception, and they remain free to openly oppose contraception. The Mandate requires nothing more than that the companies, *not the Gilardis*, offer medical insurance that includes coverage of contraceptive services for those employees who want it. The Supreme Court has never applied the Free Exercise Clause to find a substantial burden on a plaintiff's religious exercise where the plaintiff is not himself required to take or forgo action that violates his religious beliefs, but is merely required to take action that might enable other people to do things that are at odds with the plaintiff's religious beliefs. Therefore, the Gilardis cannot claim to be substantially burdened by the Affordable Care Act—a neutral statute of general applicability that regulates public health and welfare and in no way limits their exercise of religion.

4

If I were to indulge the implausible suggestion that the Mandate imposes a substantial burden on Appellants' exercise of religion, I would disagree with the majority's conclusion that the Government has failed to establish that the Mandate is the least restrictive means of furthering a compelling interest. When the record in this case is viewed through the lens of well-established precedent, the Mandate easily satisfies the requirements of the compelling governmental interest test.

As the Supreme Court made clear in *United States v. Lee*, 455 U.S. 252 (1982), a decision that has been repeatedly cited and never questioned:

> Congress and the courts have been sensitive to the needs flowing from the Free Exercise Clause, *but every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs. When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.*

*Id.* at 261 (emphasis added). Freshway and the Gilardis get no pass on this rule merely because the companies are solely owned by the Gilardis. *Lee* and other like authorities show that Appellants' claim on the merits is spurious.

## I. STANDING

### A. The Companies Have No Standing to Pursue a Cause of Action Under RFRA

Although the Supreme Court has long recognized Free Exercise protection for individuals and religious organizations, "the nature, history, and purpose" of the Clause counsel against extending the right to nonreligious corporate entities. *See First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 778 n.14 (1978); *Grote v. Sebelius*, 708 F.3d 850, 857 (7th Cir. 2013) (Rovner, J., dissenting) ("General business corporations do not, separate and apart from the actions or belief systems of their individual owners or employees, exercise religion." (quoting *Hobby Lobby Stores, Inc. v. Sebelius*, 870 F. Supp. 2d 1278, 1291 (W.D. Okla. 2012))); *see also Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 724 F.3d 377, 384 (3d Cir. 2013) ("*Citizens United* [*v. FEC*, 558 U.S. 310 (2010),] is . . . grounded in the notion that the Court has a long history of protecting corporations' rights to free speech. . . . [T]here is [not] a similar history of courts providing free exercise protection to corporations.").

The dispositive point here is that while general business corporations may engage in expression related to their business interests, independent of their owners' interests, general business corporations "do not pray, worship, observe sacraments or take other religiously-motivated actions separate and apart from the intention and direction of their individual actors." *Grote*, 708 F.3d at 857 (Rovner, J., dissenting) (quoting *Hobby Lobby*, 870 F. Supp. 2d at 1291). Therefore, "[r]eligious exercise is, by its nature, one of those 'purely personal' matters referenced in [*Bellotti*, 435 U.S. at 778 n.14] which is not the province of a general business

corporation." *Id.* Freshway has conceded that it is not a religious organization for purposes of the Free Exercise Clause; therefore, the companies have no standing to pursue a claim under RFRA.

**B. The Owners of the Companies Have Standing in This Case to Pursue a Cause of Action Under RFRA**

Unlike Freshway, the Gilardis satisfy the requirements of Article III and are not barred for want of standing from pursuing a cause of action under RFRA.

The Government argues that

Plaintiffs cannot circumvent the distinction between religious organizations and secular companies by attempting to shift the focus of the RFRA inquiry from Freshway Foods to the Gilardis, who are the corporations' controlling shareholders. . . . The[] obligations [of the Affordable Care Act] lie with the corporations themselves. *The Gilardis cannot even establish standing to challenge the contraceptive-coverage requirement, much less demonstrate that the requirement may be regarded as a substantial burden on their personal exercise of religion.*

Br. for the Appellees at 24 (emphasis added). It appears that the Government has conflated the requirements of Article III standing with the merits of the Gilardis' claim under RFRA. Indeed, apart from the foregoing passing reference to "standing," the Government never bothers to address the requirements of Article III. Rather, it rests principally on its claim that an action to redress injuries to a corporation cannot be maintained by a stockholder in his own name. *Id*. at 25.

To satisfy Article III's standing requirements, a plaintiff must show that (1) he or she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The Gilardis easily satisfy these requirements.

As the sole owners of the companies, the Gilardis are inextricably tied to Freshway. They therefore suffer injury in fact because they cannot operate their businesses according to their faith. Br. of Appellants at 16-17. Furthermore, the Gilardis injury is imminent and concrete, it is caused by the Mandate, and it will be redressed by a favorable judicial decision. Therefore, the Gilardis have Article III standing to pursue a cause of action under RFRA.

It is true that when a plaintiff's asserted injury is based on governmental regulation of a third party, proof of standing may be problematic. *See, e.g.*, *Allen v. Wright*, 468 U.S. 737, 758-59 (1984); *Simon v. E. Ky. Welfare Rights Org*., 426 U.S. 26, 41-46 (1976); *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ*., 366 F.3d 930, 938-39 (D.C. Cir. 2004). This is because the necessary elements of causation and redressability in such a case rest on the independent choices of the regulated third party. As such, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Defenders of Wildlife*, 504 U.S. at 562. There is no such third-party standing problem with respect to the Gilardis' claim.

This case presents a situation in which a for-profit corporation is fully owned by two related shareholders. Freshway and the shareholder-owners are separate legal entities, but are otherwise inextricably connected. The Gilardis control the corporations and feel a concomitant responsibility to manage the companies' business activities consistent with their Catholic faith. This connection between the Government Mandate and Freshway's conduct leaves little doubt regarding the requirements of causation and redressability under Article III. We have upheld standing in cases involving Government regulation of third parties where the connection between the Government action and the third-party conduct was less clear than it is in this case. *See, e.g.*, *Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 309-10 (D.C. Cir. 2001) (holding that the Government's addition of dioxin to the list of known carcinogens caused municipalities and companies to reduce or end their use of PVC plastic produced by the plaintiff-manufacturer, and that a decision setting aside the Government's action likely would give redress to the manufacturer). There is no question here that the Mandate compels Freshway to take action that the Gilardis challenge under RFRA. Therefore, causation and redressability are satisfied.

Finally, because RFRA provides that "[s]tanding to assert a claim or defense under [the Act] shall be governed by the general rules of standing under article III of the Constitution," 42 U.S.C. § 2000bb-1(c), the Gilardis clearly have met the *only* requirements for standing that are set forth in RFRA.

The Government ignores the requirements of Article III standing and, instead, rests its argument on "the bedrock principle that a corporation is 'a distinct legal entity, with legal rights, obligations, powers, and privileges different from

those of the natural individuals who created it, who own it, or whom it employs.'" Br. for the Appellees at 26 (citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001)). Apparently, the Government means to suggest that this "bedrock principle" effectively forecloses the Gilardis' standing to pursue a claim under RFRA. Or, to put it another way, the Government seems to contend that the cited principle is the foundation for a prudential rule that limits a claimant's right to pursue a cause of action under RFRA even when the claimant has satisfied the requirements of Article III. The Government cites no Supreme Court authority to support this proposition, and I can find none.

First, contrary to the Government's argument, the general rule relating to shareholder suits is not inviolate. As the Supreme Court noted in *Franchise Tax Board of California v. Alcan Aluminium Limited*, there is "an exception to this rule allowing a shareholder with a direct, personal interest in a cause of action to bring suit even if the corporation's rights are also implicated." 493 U.S. 331, 336 (1990). The Gilardis' claim under RFRA asserts a cause of action in their own right for an alleged denial of their exercise of religion. This does not offend the shareholder standing rule.

Second, although the Government does not explicitly assert that the shareholder standing rule is a prudential standing requirement, the Sixth Circuit reached this conclusion in *Autocam Corporation v. Sebelius*, No. 12-2673, 2013 WL 5182544 (6th Cir. Sept. 17, 2013). While recognizing that RFRA provides only that the Article III requirements must be met for standing, the Sixth Circuit nonetheless concluded that prudential requirements must also be satisfied. The *Autocam* decision first points out that "'Congress legislates against the background of [the Supreme Court's] prudential standing doctrine, which applies unless it

is expressly negated.'" *Id*. at \*4 (quoting *Bennett v. Spear*, 520 U.S. 154, 163 (1997)). The decision then goes on to say that, because "RFRA makes no mention of prudential standing" nor states "that Article III constitutes the exclusive set of requirements for standing," prudential standing requirements must apply in RFRA cases in addition to Article III requirements. *Id.* Finally, the decision holds that the shareholder standing rule is an established component of prudential standing doctrine. *Id*. I respectfully disagree.

*Autocam* cites *Franchise Tax* in support of the proposition that the shareholder standing rule is a component of prudential standing doctrine. But *Franchise Tax* merely stated that "we think" the "shareholder standing" rule is "related to" the principle of prudential standing that requires a plaintiff to assert his own legal interests. 493 U.S. at 336. *Franchise Tax* did not actually rely on the shareholder standing rule to conclude that the plaintiff lacked standing. *Id.* at 338. We can find no Supreme Court decision applying the shareholder standing rule to uphold the dismissal of a party's law suit for want of "prudential standing," nor can we find a decision citing *Franchise Tax* for this general idea.

*Autocam*'s reliance on *Bennett v. Spear* also seems misplaced. In *Bennett*, the prudential standing doctrine to which the Court was referring was the "zone of interest" test, not the shareholder standing rule. 520 U.S. 162-63. In many cases involving challenges to administrative agency actions, in addition to determining whether a petitioner has Article III standing, a court must also determine "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970). The zone of interest inquiry, which is "basically one

of interpreting congressional intent," *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 394 (1987), is a prudential requirement that applies unless expressly negated by Congress. *See Bennett*, 520 U.S. at 163. There is not the slightest doubt in this case that the Gilardis' cause of action is within the zone of interests protected by RFRA.

As already noted, the *Autocam* decision rests in part on the assumption that "Congress did not remove [the] prudential [shareholder] standing limitations when it enacted RFRA." 2013 WL 5182544, at *4. This reasoning is fallacious because neither the Government nor the Sixth Circuit cites any authority holding that the shareholder standing rule was a prudential limitation governing Free Exercise claims before the enactment of RFRA. Since the Supreme Court has never held that such a prudential standing requirement limits who may pursue Free Exercise claims, it is a *non sequitur* to say that "Congress legislates against the background of [the Supreme Court's] prudential standing doctrine." *Id.* (alterations in original).

Third, *Bennett* makes clear that prudential standing can be negated by Congress. If there were any prudential standing requirements applicable to Free Exercise claims before the enactment of RFRA, Congress eliminated them when RFRA was passed. In *Bennett*, the Court held that a statutory provision stating that "any person may commence a civil suit" was sufficient to make it clear that any party who satisfied the requirements of Article III could bring suit to challenge an agency action under the statute. 520 U.S. at 164. The holding in *Bennett* controls the disposition in this case with respect to prudential standing. RFRA tellingly states that "[s]tanding to assert a claim or defense . . . shall be governed by the general rules of standing under article III of the Constitution." 42 U.S.C. § 2000bb–1(c). The phrase "shall be governed by"

makes it plain that Article III, and nothing more, controls with respect to claims under RFRA.

In sum, I agree with the majority that the Gilardis have standing to pursue a claim under RFRA. It is important to note, however, that the Gilardis' standing rests on their inextricable ties to Freshway. The companies are operated as an extension of the two owners' religious beliefs; there are no minority shareholders with different views. Thus, the cognizable constitutional injury—an alleged encroachment on personal religious exercise—only exists in this case because the Gilardis' fully-owned companies are a vehicle by which they express their personal religious views, e.g., they direct delivery trucks to display bumper stickers conveying "their religious views regarding the sanctity of human life to the public." Br. of Appellants at 11-12.

The Mandate applying to their companies touches the Gilardis' religious exercise rights under RFRA. The touching is not substantial, but it is sufficient to satisfy the requirements of Article III. The merits of the Gilardis' claim under RFRA is quite another matter, however.

## II.   FREE EXERCISE JURISPRUDENCE

## A.   First Principles: The Limited Reach of the Free Exercise Clause

Through the entire history of Free Exercise jurisprudence, the Supreme Court has remained true to the principle that the Free Exercise Clause does not ensure freedom from any regulation to which a party holds a religious objection. Indeed, the Court has consistently recognized that any such rule would be problematic because it "would place beyond the law any act done under claim of

religious sanction." *Cleveland v. United States*, 329 U.S. 14, 20 (1946); *accord Reynolds*, 98 U.S. at 167 ("To permit this would . . . in effect . . . permit every citizen to become a law unto himself. Government could exist only in name under such circumstances.").

In early cases, the Supreme Court routinely held that religious activities must be subordinate to general public welfare legislation. Mormons were thus not exempt for the sake of religious exercise from laws criminalizing polygamy. *Reynolds*, 98 U.S. at 145; *Cleveland*, 329 U.S. at 20. A child who wished to distribute religious literature with her family was not exempt from child labor laws. *Prince v. Massachusetts*, 321 U.S. 158, 167 (1944) ("[T]he state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare; and that includes, to some extent, matters of conscience and religious conviction."). And in *Braunfeld v. Brown*, the Court upheld the application of a Sunday closing law to Jewish merchants who observed the Sabbath on Saturday, even though the law "ma[de] the practice of their religious beliefs more expensive" by forcing them to close two days a week. 366 U.S. at 605; *accord McGowan v. Maryland*, 366 U.S. 420 (1961). The Sunday closing law was intended to establish a "day of community tranquility, respite and recreation" for the general well-being of citizens, *Braunfeld*, 366 U.S. at 602, and "[t]o strike down . . . legislation which imposes only an indirect burden on the exercise of religion . . . would radically restrict the operating latitude of the legislature." *Id.* at 606.

When one studies the history of Free Exercise jurisprudence in the United States, it is inescapable that the Free Exercise Clause of the First Amendment has been narrowly defined for good reasons. This point was amplified by Justice O'Connor in *Lyng*:

However much we might wish that it were otherwise, government simply could not operate if it were required to satisfy every citizen's religious needs and desires. A broad range of government activities—from social welfare programs to foreign aid to conservation projects—will always be considered essential to the spiritual well-being of some citizens, often on the basis of sincerely held religious beliefs. Others will find the very same activities deeply offensive, and perhaps incompatible with their own search for spiritual fulfillment and with the tenets of their religion. The First Amendment must apply to all citizens alike, and it can give to none of them a veto over public programs that do not prohibit the free exercise of religion. The Constitution does not, and courts cannot, offer to reconcile the various competing demands on government, many of them rooted in sincere religious belief, that inevitably arise in so diverse a society as ours. That task, to the extent that it is feasible, is for the legislatures and other institutions.

485 U.S. at 452.

**B. The Evolution of the Substantial Burden/Compelling Governmental Interest Test During the Twenty-seven Years from *Sherbert* to *Smith***

RFRA states in relevant part:

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person –

  (1) is in furtherance of a compelling governmental interest; and

  (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb-1.

RFRA was enacted to overturn the Supreme Court's decision in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), which had vitiated the substantial burden/compelling governmental interest test enunciated in *Sherbert*, 374 U.S. 398. *See* 42 U.S.C. § 2000bb(b)(1) (stating that a purpose of the statute is "to restore the compelling interest test as set forth in" *Sherbert*). It is also undisputed that, in passing RFRA, Congress meant to restore the *entire body* of Free Exercise jurisprudence that developed during the twenty-seven years following the Court's decision in *Sherbert* up until the Court's decision in *Smith*. *See, e.g.*, S. REP. NO. 103-111, at 8-9 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1898; H.R. REP. NO. 103-88, at 6-7 (1993). An examination of the relevant case law during these twenty-seven years confirms that, when it enacted RFRA, Congress never meant to abandon the first principles that have historically limited the reach of the Free Exercise Clause.

The compelling interest framework was first articulated in *Sherbert*, where the Court held that South Carolina violated the plaintiff's Free Exercise rights when it denied her

unemployment benefits on the grounds that observing the Sabbath did not constitute "good cause" for declining work on Saturday. 374 U.S. at 400-01. The Court explained that the state must show a compelling interest for refusing to accommodate the plaintiff's Sabbath observance. *Sherbert* cited *Braunfeld* approvingly. Unlike *Sherbert*, *Braunfeld* involved a situation in which there was "a strong state interest in providing one uniform day of rest for all workers," and "[r]equiring exemptions for Sabbatarians . . . appeared to present an administrative problem of such magnitude, or to afford the exempted class so great a competitive advantage, that such a requirement would have rendered the entire statutory scheme unworkable." *Id.* at 408-09. In *Sherbert*, however, as the Court later explained, the Government acted pursuant to a statutory scheme that created "a mechanism for individualized exemptions." *Bowen v. Roy*, 476 U.S. 693, 708 (1986). When a "state creates such a mechanism, its refusal to extend an exemption to an instance of religious hardship . . . tends to exhibit hostility, not neutrality, towards religion." *Id.*

In the majority of the Free Exercise cases decided during the twenty-seven years following *Sherbert*, the Court applied this compelling interest framework to hold either (a) that there was no substantial burden on religious exercise, or (b) that the burden was justified by the Government's interest in administering a statutory scheme that, by its nature, required uniform enforcement in order to be administrable. The Court amplified these lines of analysis in *Lee*.

In *Lee*, the Court upheld the Government's application of Social Security taxes to an Amish employer who held a religious objection to the Social Security system. Accepting the plaintiff's "contention that both payment and receipt of social security benefits is forbidden by the Amish faith," the Court concluded that Social Security taxes imposed a

substantial burden on Lee's Free Exercise. 455 U.S. at 257. Nonetheless, the Court found the burden justified because in *Lee*, as in *Braunfeld*, uniform application of the law was necessary to make general public welfare regulations administrable: "[M]andatory participation [by all covered employers and employees] is indispensable to the fiscal vitality of the . . . system," *id.* at 258, and "[t]he tax system could not function if denominations were allowed to challenge [it] because tax payments were spent in a manner that violates their religious belief." *Id.* at 260.

In at least six more Free Exercise cases decided during the twenty-seven years post-*Sherbert*, the Court applied the substantial burden/compelling governmental interest framework to hold that the disputed Government action or regulation imposed no substantial burden, or that the burden was justified under the reasoning in *Lee* and *Braunfeld*:

- *Gillette v. United States*, 401 U.S. 437, 461 (1971) (the Military Selective Service Act, exempting persons who oppose participating in war generally, but not those who hold religious objections to a particular war, does not violate Free Exercise) ("Our cases do not at their farthest reach support the proposition that a stance of conscientious opposition relieves an objector from any colliding duty fixed by a democratic government.").

- *Bob Jones Univ. v. United States*, 461 U.S. 574, 603-04 (1983) (denying tax-exempt status to a religious school that practiced racial discrimination as part of a religious belief against interracial dating and marriage did not violate Free Exercise) ("Th[e] governmental interest [in eradicating racial discrimination] substantially outweighs whatever burden denial of tax

benefits places on petitioners' exercise of their religious beliefs." (citing *Lee*, 455 U.S. at 259-60; *Prince,* 321 U.S. at 170; *Gillette,* 401 U.S. 437; and *Reynolds*, 98 U.S. 145)).

- *Hernandez v. Comm'r*, 490 U.S. 680, 698 (1989) (denying tax deductible status to fees paid for training sessions that were "the central practice of Scientology" did not violate Free Exercise); *id.* at 699-700 ("*Lee* establishes that even a substantial burden would be justified by the 'broad public interest in maintaining a sound tax system,' free of 'myriad exceptions flowing from a wide variety of religious beliefs.'" (quoting *Lee*, 455 U.S. at 260)).

- *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 303 (1985) (the Fair Labor Standards Act did not burden the religious exercise of a non-profit religious organization or its "associates," who received food and shelter in exchange for work carrying out the organization's commercial enterprises).

- *Bowen*, 476 U.S. at 706-07 (rejecting a claim that using a social security number to administer Government programs violated the Free Exercise of Native Americans who believed the number would impair their child's spirit) ("[T]he nature of the burden is relevant to the standard the government must meet to justify the burden. . . . [A]dministration of complex [benefits] programs requires certain conditions and restrictions. Although in some situations, a mechanism for individual consideration will be created, a policy decision . . . to treat all applicants alike and . . . not . . . to become involved in case-by-case inquiries into the

genuineness of each religious objection . . . is entitled to substantial deference." (citing *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 717-18 (1989); *Sherbert*, 374 U.S. at 404)).

- *Lyng*, 485 U.S. at 442 (no substantial burden on religious exercise even though building a road across a stretch of national forest that would "cause serious and irreparable damage to the sacred areas which are an integral and necessary part of the belief systems and lifeway" of the Native American tribes); *id.* at 450-51 ("[*Sherbert*] does not and cannot imply that incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, require government to bring forward a compelling justification. . . .").

During this same twenty-seven year period, the Court found Free Exercise violations only when the disputed governmental policy allowed for individualized or discrete exemptions, and the state declined to grant exemptions or exceptions to accommodate religious beliefs. Three of the four successful Free Exercise cases, like *Sherbert*, presented a discretionary decision as to whether the plaintiff had "good cause" for refusing employment that conflicted with their religious practice. *Thomas*, 450 U.S. 707 (claimant denied unemployment benefits because he refused a job assembling weapons on the grounds of a religious objection); *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136 (1987) (claimant was denied unemployment benefits because of refusal to work on the Sabbath); *Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829 (1989) (claimant denied unemployment benefits because he refused to work on Sunday).

In the fourth case, *Wisconsin v. Yoder*, 406 U.S. 205 (1972), the Court held that the state lacked a compelling interest in requiring Amish families to send their children to school for the ninth and tenth grades. The Court reiterated that "[i]t is true that activities of individuals, even when religiously based, are often subject to regulation . . . to promote the health, safety, and general welfare." *Id.* at 220 (citing *Gillette*, 401 U.S. 437; *Braunfeld*, 366 U.S. 599; *Prince*, 321 U.S. 158; *Reynolds*, 98 U.S. 145). But it concluded that the state had not shown why its educational objectives required Amish children to attend "an additional one or two years of formal high school . . . in place of their long-established program of informal vocational education." *Id.* at 222. In other words, there was no demonstrated need for a uniform attendance rule. Indeed, the accommodation sought by the Amish was not at odds with the state's objective of ensuring meaningful education for minors. Therefore, the Court concluded that the Government simply had not shown that the state's educational objectives would be compromised by granting a discrete exemption for Amish students.

In sum, a careful reading of the Supreme Court's Free Exercise decisions during the twenty-seven years post-*Sherbert* shows that Free Exercise challenges to generally applicable, neutral Government policies were rarely successful. *See* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 HARV. L. REV. 1409, 1417 (1990) ("Since 1972, the Court has rejected every claim for a free exercise exemption to come before it, outside the narrow context of unemployment benefits governed strictly by *Sherbert*." (footnotes omitted)).

**C. Congress' Enactment of RFRA in Reaction to *Smith*: Restoration of the Substantial Burden/Compelling Governmental Interest Test**

After twenty-seven years of consistently applying the substantial burden/compelling governmental interest framework to decide cases arising under the Free Exercise Clause, the Supreme Court inexplicably discarded this analytical framework in *Smith*, 494 U.S. 872. The reaction from Congress was swift and clear.

In *Smith,* the Court held that criminalizing the use of peyote did not violate the free exercise of Native American sects that traditionally used the hallucinogen during religious ceremonies. The Court did not require the state to provide a compelling justification for denying an exemption, stating that the *Sherbert* compelling interest test was "inapplicable" to "an across-the-board criminal prohibition on a particular form of conduct." *Id.* at 884-85. While pre-*Smith* cases had often applied the compelling interest framework to conclude that a claimant's religious exercise was not substantially burdened, or that the Government's compelling interest justified any burden, *Smith* went a step further by eliminating this framework entirely.

In response to *Smith*, Congress enacted RFRA. The statute notes that "the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion." 42 U.S.C. § 2000bb(a)(4). It then states that the purpose of RFRA is to "restore the compelling interest test as set forth" in *Sherbert* and *Yoder* and to "guarantee its application in all cases where free exercise of religion is substantially burdened." *Id.* § 2000bb(b)(1).

Reports from both houses make clear that Congress sought to restore the *entire body* of Free Exercise jurisprudence as it existed during the twenty-seven years post-*Sherbert.* S. REP. NO. 103-111, at 9 ("Pre-*Smith* case law makes it clear that only governmental actions that place a substantial burden on the exercise of religion must meet the compelling interest test. . . . The act thus would not require such a justification for every government action that may have some incidental effect on religious institutions. . . . [T]he compelling interest test generally should not be construed more stringently or more leniently than it was prior to *Smith*."); H.R. REP. NO. 103-88, at 7 ("This bill is not a codification of any prior free exercise decision but rather the restoration of the legal standard that was applied in those decisions. . . . [T]he [compelling interest] test generally should not be construed more stringently or more leniently than it was prior to *Smith*."); 139 CONG. REC. S26178 (daily ed. Oct. 26, 1993) (statement of Sen. Kennedy) ("Not every free exercise claim will prevail, just as not every claim prevailed prior to the *Smith* decision."). Indeed, RFRA itself says that "the compelling interest test as set forth in *prior Federal court rulings* is a workable test for striking sensible balances between religious liberty and competing prior governmental interests." 42 U.S.C. § 2000bb(a)(5) (emphasis added).

Senator Hatch, a sponsor of RFRA, explained that the bill was amended to add the word "substantial" before "burden" so as to be "consistent with the case law developed by the Court prior to the *Smith* decision" that "does not require the Government to justify every action that has some effect on religious exercise." 139 CONG. REC. S26180 (daily ed. Oct. 26, 1993) (statement of Sen. Hatch).

Since the passage of RFRA, the Supreme Court has confirmed that, as Congress intended, RFRA reinstates the full body of pre-*Smith* jurisprudence. In *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006), the Court held that declining to permit a "Christian Spiritist" sect's sacramental use of hoasca, a hallucinogenic tea prohibited by the Controlled Substances Act, violated Free Exercise under RFRA. The Government conceded that prohibiting the sect from using hoasca imposed a substantial burden on the group's religious exercise. *Id.* at 426. The Court made clear that the principles of *Braunfeld* and *Lee* still apply under RFRA, explaining that "the Government can demonstrate a compelling interest in uniform application of a particular program by offering evidence that granting the requested religious accommodations would seriously compromise its ability to administer the program." *Id.* at 435.

Applying these principles, the Court concluded that the Government failed to prove that the Controlled Substances Act required uniform application in order to be administrable. Critical to this conclusion was the fact that the Controlled Substances Act authorized the Attorney General to "'waive the requirement for registration of certain manufacturers, distributors, or dispensers if he finds it consistent with the public health and safety.'" *Id.* at 432 (quoting 21 U.S.C. § 822(d)). Furthermore, the Act granted an exemption to all members of Native American tribes for the sacramental use of peyote. *Id.* at 433. "The well-established peyote exception also fatally undermines the Government's broader contention that the Controlled Substances Act establishes a closed regulatory system that admits of no exceptions under RFRA." *Id.* at 434. *O Centro* easily fits within the body of Free Exercise cases decided during the twenty-seven years post-*Sherbert*.

### III. THE MANDATE DOES NOT *SUBSTANTIALLY* BURDEN APPELLANTS' RELIGIOUS OBJECTIONS TO THE USE OF CONTRACEPTIVE PRODUCTS

Requiring Freshway's health plan to cover contraceptive products does not *substantially* burden the Gilardis' personal objection to using contraception. The Gilardis have standing in this case only because of the alleged injuries that arise from the Mandate's application to their companies, not to them. Their alleged injuries are sufficient to satisfy the requirements of Article III, but they have failed to show that the Mandate *substantially* burdens their personal religious activities.

There are three reasons why the Mandate does not *substantially* burden the Gilardis' "exercise of religion." First, the Mandate does not require the Gilardis to use or purchase contraception themselves. Second, the Mandate does not require the Gilardis to encourage Freshway's employees to use contraceptives any more directly than they do by authorizing Freshway to pay wages. Finally, the Gilardis remain free to express publicly their disapproval of contraceptive products.

Because the Mandate does not require the Gilardis to personally engage in conduct prohibited by their religious beliefs, this case differs from every case in which the Court has found a substantial burden on religious exercise. In *O Centro* and *Yoder*, for instance, there was no dispute as to whether the regulations substantially burdened the plaintiffs' religious exercise. The disputed Government policies in those cases very plainly prevented the plaintiffs, personally, from engaging in their religious practices (using hoasca and home-schooling one's children), and the only question was whether the burdens were justified.

In contrast, the Gilardis cannot claim that they are being forced to use contraceptives, which would directly conflict with their religious beliefs. Rather, they complain that because *their companies* are required to purchase insurance that includes coverage for contraception, they as owners are enabling third parties to engage in conduct that they oppose. This is a specious claim. The Gilardis can find no support for their position in the controlling case precedents. No Free Exercise decision issued by the Supreme Court has recognized a substantial burden on a plaintiff's religious exercise where the plaintiff is not *himself* required to take or forgo action that violates his religious beliefs, but is merely required to take action that *might* enable other people to do things that are at odds with the plaintiff's religious beliefs.

Furthermore, the Mandate does not require the Gilardis to directly facilitate employees' use of contraception. The Gilardis do not contend that their religious exercise is violated when Freshway pays wages that employees might use to purchase contraception, and the Mandate does not require the Gilardis to facilitate the use of contraception any more directly than they already do by authorizing Freshway to pay wages. Amici supporting the Gilardis' position attempt in vain to distinguish between the Mandate and paying wages. First, they argue that the Mandate requires the Gilardis to become an "essential cause" of increasing the number of employees who use contraception. Br. of 28 Catholic Theologians and Ethicists at 22-23. But the Gilardis are no more of an "essential cause" of increasing the use of contraception when they authorize Freshway to pay for a benefits plan that employees *might* use to get contraception than they are when they authorize wages that an employee *might* use to purchase contraception she would not otherwise be able to afford.

Amici also attempt to distinguish between the Mandate and paying wages by arguing that covering contraceptive products is akin to the difference between giving an underage person a "gift certificate" to buy beer, and giving him money that he might spend on beer. *Id.* at 21-22. But this analogy fails. Health coverage under the Mandate is not like giving a gift certificate to buy beer specifically, but more like a gift certificate to a supermarket where the recipient may purchase whatever is available, including beer. Just as the Government does not directly encourage religion when it provides vouchers that recipients *may* choose to spend on religious schools, the Gilardis do not directly encourage the use of contraception when they provide insurance coverage that recipients *may* choose to spend on contraceptives. *Zelman v. Simmons-Harris*, 536 U.S. 639, 652 (2002) ("The incidental advancement of a religious mission, or the perceived endorsement of a religious message, is reasonably attributable to the individual recipient, not to the [party granting the benefits], whose role ends with the disbursement of benefits.").

Amici also contend that the difference between the Mandate and paying wages is akin to the difference between a person who opposes the death penalty being required to pay taxes that fund executions, and being required to "purchase the drugs for a lethal injection and personally deliver them to the facility where the execution will take place." Br. of 28 Catholic Theologians and Ethicists at 19. The problem with this rather extraordinary example is that the Mandate does not require the Gilardis to have nearly this degree of personal involvement in providing contraceptives. The Mandate does not require the Gilardis to transfer funds from Freshway's accounts directly to the manufacturers or retailers of contraception. Nor are the companies required to deliver or distribute contraception to employees. Under the Employee

Retirement Income Security Act, 29 U.S.C. § 1132(d)(1), Freshway is a distinct legal entity from its self-insured group health plan. The plan is operated by a third-party administrator, and, pursuant to health privacy regulations, the Gilardis are actually prohibited from being informed whether individual employees purchase contraceptive products, or about any other information regarding employees' health care decisions. *See* Br. of Americans United for Separation of Church and State, *et al.*, at 29-30 (citing 45 C.F.R. § 164.508; 45 C.F.R. § 164.510). Moreover, the Gilardis are free to procure Mandate-compliant coverage for their employees through an entirely independent, third-party insurance carrier, rather than administering their own group health plan. *Id.* This is a far cry from personally purchasing contraceptives and delivering them to employees.

Finally, the Gilardis suggest that because Freshway is required to offer health insurance that includes contraception, they as owners are being pressed to effectively endorse the use of contraception. This claim fails because the Supreme Court has held that a party's First Amendment rights are not violated when he must comply with a Government policy that sends a message contrary to his beliefs. Hence, an institute of higher education may be required to host military recruiters on campus, even if it strongly opposes military policy. *See Rumsfeld v. Forum for Academic & Institutional Rights, Inc.,* 547 U.S. 47 (2006). Parties who comply with a regulation contrary to their beliefs "remain[] free to disassociate [themselves] from those views." *Id.* at 65 (citation omitted). The Gilardis likewise remain free to "disassociate" themselves from any message that might suggest that they endorse contraception. They may denounce publicly the use of contraception, for instance, by issuing a statement to Freshway's employees expressing their disapproval of the Mandate and contraception; and they are free to continue

authorizing Freshway to display slogans on company delivery trucks expressing their views about the sanctity of human life. There are countless ways the Gilardis can make clear that their involuntary compliance with federal law does not signify that they endorse the use of contraception. *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8729 (Feb. 15, 2012) ("Nothing in these final regulations precludes employers or others from expressing their opposition, if any, to the use of contraceptives, requires anyone to use contraceptives, or requires health care providers to prescribe contraceptives if doing so is against their religious beliefs.").

For the foregoing reasons, the Gilardis simply cannot establish that the Mandate *substantially* burdens their personal objection to contraception. The Mandate does not regulate the Gilardis; it regulates their *companies*. So the Mandate requires nothing of the Gilardis, save what is required of any managers of business operations subject to federal law. And we do not normally assume that managers of for-profit companies are personally affronted by the requirements of federal law.

More particularly, the Mandate does not require the Gilardis to use or purchase contraception themselves; it does not require them to facilitate Freshway's employees' use of contraceptives any more directly than they do by authorizing Freshway to pay wages; and they remain free to publicly express their disapproval of contraceptive products. Because the Gilardis cannot show a *substantial* burden on their personal religious exercise, they cannot prevail on the merits of their RFRA claim as a matter of law. I would therefore affirm the District Court's denial of a preliminary injunction

on this ground, without inquiring into whether the Mandate serves a compelling governmental interest.

## IV. COMPELLING GOVERNMENTAL INTERESTS JUSTIFY THE MANDATE

Even though I would deny the preliminary injunction on the ground that the Gilardis cannot show that the Mandate substantially burdens their exercise of religion, I will also address the Government's compelling interests in order to respond to my colleagues' opinion on this point.

In *O Centro*, the Court made clear that "the Government can demonstrate a compelling interest in uniform application of a particular program by offering evidence that granting the requested religious accommodations would seriously compromise its ability to administer the program." 546 U.S. at 435. The Government has met this test in defending the Mandate. The Mandate therefore satisfies the compelling interest test under *O Centro*, *Lee*, *Braunfeld*, and *Hernandez.*

The Mandate obviously serves the compelling interests of promoting public health, welfare, and gender equality. Br. for the Appellees 38-40. *See, e.g*., *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987) ("Even if [the Act] does work some slight infringement on [plaintiffs'] right of expressive association, that infringement is justified because it serves the State's compelling interest in eliminating discrimination against women."); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 626 (1984) ("Assuring women equal access to . . . goods, privileges, and advantages clearly furthers compelling state interests."); *Prince*, 321 U.S. 158 (upholding child labor laws); *Olsen v. DEA*, 878 F.2d 1458, 1462 (D.C. Cir. 1989) (upholding laws regulating drug use).

Contraceptive products are used for health care purposes beyond preventing unwanted pregnancy. They are prescribed to prevent disease. Contraceptives reduce the risk of ovarian, endometrial, and gynecologic cancers. *See* Br. of the Ovarian Cancer Nat'l Alliance, *et al.* at 5-25 (describing how the Mandate is based, in part, on ensuring that women have access to cancer-preventative benefits unrelated to preventing pregnancy). Contraceptives and sterilization also preserve the health of adult women with diabetes, lupus, and heart conditions, who would be at physical risk if they became pregnant. *See* Br. of Nat'l Health Law Program, *et al.* at 7-13.

Coverage for contraceptive products eliminates gender discrimination because the cost of contraception falls disproportionately on women, and the costs of health care are generally much higher for women than men. Br. for the Appellees at 41 ("Congress found that . . . 'women of childbearing age spend 68 percent more in out-of-pocket health care costs than men.'" (quoting 155 CONG. REC. S28843 (daily ed. Dec. 1, 2009) (statement of Sen. Gillibrand))). Gender inequality in the cost of health care is caused, in part, by the fact that many health services specific to women have historically been excluded from insurance coverage. *See* Br. for Nat'l Women's Law Center, *et al.* at 7 ("Congress intended . . . to help alleviate the 'punitive practices of insurance companies that charge women more and give [them] less in benefits.'" (quoting 155 CONG. REC. S28842 (Dec. 1, 2009) (statement of Sen. Mikulski))).

Furthermore, it is critical to the functioning of the Affordable Care Act's statutory scheme that exemptions from the Mandate are, like exemptions from the Social Security tax, extremely limited. Allowing religious exemptions to for-profit, secular corporations would undermine the universal coverage scheme: If the Gilardis' companies were exempted

31

from covering contraception, another corporation's owners might just as well seek a religious exemption from covering certain preventative vaccines. A Christian Scientist, whose religion has historically opposed conventional medical treatment, might claim that his corporation is entitled to a religious exemption from covering all medical care except healers who treat medical ailments with prayer. Paul Vitello, *Christian Science Seeks Truce with Modern Medicine*, N.Y. TIMES, Mar. 24, 2010, at A20, *available at* http://www.nytimes.com/2010/03/24/nyregion/24heal.html?p agewanted=all&_r=0 (last visited Oct. 13, 2013). Muslim or Jewish business owners might claim a religious exemption from covering any medication derived from pork products (for instance, the gelatin used to make capsules or coating of many pills). S. Pirzada Sattar & Debra A. Pinals, Letter to the Editor, *When Taking Medications Is a Sin*, 53 PSYCHIATRIC SERVICES 213 (2002), *available at* http://journals.psychiatryonline.org/article.aspx?Volume=53& page=213&journalID=18 (last visited Oct. 13, 2013). Just as in *Lee* and *Braunfeld*, "[t]he whole point of . . . a 'uniform' [policy] would . . . be[] defeated by exceptions." *O Centro*, 546 U.S. at 435 (quoting *Sherbert*, 374 U.S. at 408 (discussing *Braunfeld,* 366 U.S. at 608-09)).

The existing exemptions to the Mandate do not establish that the Government lacks a compelling interest in enforcing it against all large, for-profit secular employers. First, the exemptions are not as broad as the Gilardis make them out to be. The exemption for grandfathered plans is temporary, intended to be a means for gradually transitioning employers into mandatory coverage. A health plan loses grandfathered status as soon as it changes its cost-sharing, benefits, or employer-contribution terms. 45 C.F.R. § 147.140(g). The Department of Health and Human Service's "mid-range estimate" is that 66% of small employer plans and 45% of

large employer plans will relinquish their grandfathered status by the end of 2013. Interim Final Rules for Group Health Plans and Health Insurance, 75 Fed. Reg. 34,538, 34,552 (June 17, 2010).

In fact, the Gilardis voluntarily relinquished Freshway's grandfathered status by increasing the employees' co-payments for doctor visits. Br. for the Appellees at 43; Joint Appendix at 25. That the Gilardis voluntarily relinquished grandfathered status despite their opposition to the Mandate supports the Department's prediction that most other employers are likely to do so in the short term, as they will inevitably modify their coverage plans to accommodate changes in the cost of health care.

Furthermore, contrary to the Gilardis' suggestion, employers with fewer than fifty employees are not specifically exempted from the Mandate. Rather they are exempt altogether from being required to provide health coverage under the Affordable Care Act. 26 U.S.C. § 4980H(c)(2)(A). Small businesses that do elect to provide health coverage—as many do in order to offer more competitive benefits to employees and to receive tax benefits—must provide coverage that complies with the Mandate. Br. for the Appellees at 42. In other words, the Mandate would apply to the Gilardis even if they had fewer than fifty employees, so long as they chose to provide health coverage, as they contend they are committed to doing. Br. of Appellants at 13-14.

The only permanent, specific exemption from the Mandate is for religious, non-profit employers. 45 C.F.R. § 147.130(a)(1)(iv)(B) (current rules defining religious non-profits in terms of Internal Revenue Code status); Coverage of Certain Preventative Services Under the Affordable Care Act,

78 Fed. Reg. 8456, 8462 (Feb. 6, 2013) (proposed rules exempting any non-profit organization that holds itself out as a religious organization). This exemption for religious non-profits surely does not undermine the Government's position that uniform enforcement is essential to the scheme, in the way that the exemption for Native American tribes using peyote was fatal to such a claim in *O Centro*. In *O Centro*, the existing exemption for the religious use of peyote by Native American tribes was much larger than the exemption sought by the 130 members of the Christian Spiritist sect. If the Controlled Substances Act was administrable with a much larger exemption for all Native Americans, why would a smaller exemption for 130 hoasca users defeat the scheme? Furthermore, the nature of the exemption sought in *O Centro*—the Christian Seperatist sect's sacramental use of hoasca—was essentially indistinguishable from the nature of the exemption that had already been granted for the Native American tribes' sacramental use of peyote.

This case is a far cry from the situation seen in *O Centro*. The exemption sought by the Gilardis for secular, for-profit corporations is potentially *much larger* than the exemption for non-profit religious entities that exists under the Mandate. In addition, the exemption sought in this case is fundamentally different from the exemption that has already been granted. The Court has long recognized that federal workplace regulations apply differently to secular, for-profit corporations than to non-profit religious organizations. *E.g.*, *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 132 S. Ct. 694 (2012) (Free Exercise Clause shields a minister of a religious non-profit from being sued for violating the Americans with Disabilities Act); *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327 (1987) (Title VII's exemption of non-profit churches from provisions prohibiting religious discrimination does not

violate Establishment Clause); *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979) (interpreting the National Labor Relations Act as exempting Church-operated educational institutions from National Labor Review Board's jurisdiction). In exempting religious non-profits, the Department of Health and Human Services reasoned that "[r]eligious accommodations in related areas of federal law, such as the exemption for religious organizations under Title VII of the Civil Rights Act of 1964, are available to nonprofit religious organizations but not to for-profit secular organizations." Coverage of Certain Preventive Services Under the Affordable Care Act, 78 Fed. Reg. 8456, 8462 (Feb. 6, 2013). The Americans with Disabilities Act also exempts religious non-profits, but not for-profit, secular corporations. 42 U.S.C. § 12113(d)(1), (2).

If an exemption for religious non-profits were taken as proof that the Government lacks a compelling interest in enforcing regulations against secular, for-profit corporations, this would suggest that secular corporations should likewise be entitled to religious exemptions from Title VII, the National Labor Relations Act, and the Americans with Disabilities Act. Furthermore, the Mandate's exception for religious non-profits is nothing like the exceptions in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), where the ordinances prohibiting animal sacrifices were so replete with exceptions that the Court concluded their purpose was "suppression of . . . the Santeria worship service." *Id.* at 534.

It is very important to recall that the Court in *Lee* rejected the argument that limited exemptions from the Social Security tax proved the Government lacked a compelling interest in uniform enforcement all for-profit employers. The Court explained that Congress was justified in "dr[awing] a line . . .

exempting the self-employed Amish but not all persons working for an Amish employer." 455 U.S. at 261. The Court's reasoning is equally applicable here: "When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." *Id.* The Court explained that "[g]ranting an exemption from social security taxes to an employer operates to impose the employer's religious faith on the employees." *Id.*; *accord Hernandez*, 490 U.S. at 700 ("The fact that Congress has already crafted some deductions and exemptions in the Code also is of no consequence, for the guiding principle is that a tax 'must be uniformly applicable to all, except as *Congress* provides explicitly otherwise.'" (quoting *Lee*, 455 U.S. at 261)).

Freshway, the employer in *Lee*, and other for-profit corporations are different from religious non-profits in that they use labor *to make a profit*, rather than to perpetuate a religious values-based mission. In choosing to use labor for financial gain, the corporation and its owners submit themselves to legislation—such as Title VII, the Fair Labor Standards Act, the Americans with Disabilities Act, and the Affordable Care Act—designed to protect the health, safety, and welfare of employees. They cannot voluntarily capitalize on labor but invoke their personal religious values to deny employees the benefit of laws enacted to promote employee welfare.

Because the Gilardis have voluntarily chosen to capitalize on labor, they have agreed to accept certain limitations on their conduct that arise from the Government's compelling interest in securing the safety and welfare of their employees. For this reason, even if the Mandate were a substantial burden

on the Gilardis' religious exercise—which it is not—this record supports the conclusion that the burden is justified by the Government's compelling interest in enforcing a public-welfare statutory scheme that, like the Social Security tax, simply "could not function" if for-profit employers of various "denominations were allowed to challenge the . . . system because . . . payments were spent in a manner that violates their religious belief." *O Centro*, 546 U.S. at 435 (quoting *Lee*, 455 U.S. at 258).

The judgment of the District Court should be affirmed.